IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

ROBERT ERVIN,                          )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )        Case No.
                                       )        11-3325-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner of     )
Social Security,                       )
                                       )
        Defendant.                     )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Ervin seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in finding that

plaintiff's mental impairment is non-severe' in finding that plaintiff's daily activities

undermine his credibility; and in failing to find plaintiff disabled pursuant to Grid Rule

201.10, the medical-vocational guidelines.  I find that the substantial evidence in the

record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.    BACKGROUND

On September 17, 2008, plaintiff applied for disability benefits alleging that he

had been disabled since December 31, 2003.  He amended his alleged onset date to

September 17, 2008 -- the date his application was filed.  Plaintiff's disability stems from

pain in his wrists, head and neck.  Plaintiff's application was denied on October 1, 2008.

On February 8, 2010, a hearing was held before an Administrative Law Judge.  On

February 22, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On July 18, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

2

courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

                Yes = not disabled.
                No = go to next step.

Case 6:11-cv-03325-REL   Document 23   Filed 08/01/12   Page 3 of 37

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Terri Crawford, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

Plaintiff earned the following income from 1971 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1971 | $    28.50 | 1991 | $   2,021.25 |
| 1972 | 0.00 | 1992 | 360.00 |
| 1973 | 2,160.02 | 1993 | 0.00 |
| 1974 | 3,849.48 | 1994 | 0.00 |

4

| | | | |
|---|---|---|---|
| 1975 | 4,671.11 | 1995 | 0.00 |
| 1976 | 10,926.63 | 1996 | 0.00 |
| 1977 | 10,133.83 | 1997 | 0.00 |
| 1978 | 6,577.91 | 1998 | 0.00 |
| 1979 | 583.71 | 1999 | 1,486.50 |
| 1980 | 315.10 | 2000 | 14,678.14 |
| 1981 | 0.00 | 2001 | 12,939.00 |
| 1982 | 0.00 | 2002 | 3,948.00 |
| 1983 | 0.00 | 2003 | 20,466.00 |
| 1984 | 522.00 | 2004 | 0.00 |
| 1985 | 6,187.50 | 2005 | 0.00 |
| 1986 | 0.00 | 2006 | 0.00 |
| 1987 | 3,978.25 | 2007 | 0.00 |
| 1988 | 2,856.98 | 2008 | 0.00 |
| 1989 | 1,647.50 | 2009 | 0.00 |
| 1990 | 10,113.00 | | |

(Tr. at 123-129).

**Function Report - Adult**

In a Function Report dated September 21, 2008, plaintiff reported that he lives in a  house with his girl friend (Tr. at 145-152).  When asked to describe what he does from the time he wakes up until going to bed, plaintiff wrote, "nothing".  When asked whether he helps take care of anyone else, plaintiff wrote, "yes" and indicated that he tries to help with his son and his girl friend.  The numbness in his arms and hands affects his ability to dress, bathe, care for his hair, shave, feed himself, and use the toilet.  He does not prepare meals, he does no housework or yard work, he cannot hold on to anything.  He goes outside every day and walks.  He does not drive due to

5

numbness in his hands and arms. He does no shopping, he is not able to pay bills, count change, use a checkbook or handle a savings account due to numbness in his arms and hands. He cannot handle money because he cannot hold onto a pen or pencil.[1] His hobbies include watching television, playing with his son, and fishing; however, he wrote that he cannot hold a remote, his son, or a fishing pole. When asked to list the places he goes on a regular basis, he wrote, "take son to and from school, store, brother's house."

His condition limits his ability to lift, reach, complete tasks, concentrate, use his hands and his memory. These limitations are all due to pain and numbness in his hands and arms. His condition does not affect his ability to squat, bend, stand, walk, sit, kneel, talk, hear, climb stairs, see, understand, follow instructions or get along with others.

**Function Report - Adult**

In a Function Report completed on March 26, 2009, plaintiff reported that he spends his day having coffee and cigarettes, he helps get his son up and ready for school, he takes his son to school and picks him up from school, and the rest of his day depends on how much pain and numbness he has in his hands, fingers, wrists and neck (Tr. at 177-184). Plaintiff reported that his condition limits his ability to care for his hair and shave but does not affect his ability to dress, bathe, feed himself, or use the toilet. He goes outside every day by walking, driving a car, or riding in a car. After indicating that he drives, he answered the question, "do you drive" with "no" (Tr. at 179). He

_____

[1]I note that plaintiff smoked about a pack of cigarettes a day during this time and therefore had no difficulty holding onto a lighter or a cigarette.

shops for food, he is able to handle a savings account, count change, and use a checkbook. He is able to prepare his own meals daily. His hobbies include watching television, being outside with his son, fishing when he is able, listening to music, cooking on a grill, and camping. His condition affects his ability to lift, stand, reach, sit, hear, complete tasks, use his hands and his memory. These limitations are due to pain and numbness in both hands, fingers and wrist, pain in his neck, and bad headaches (Tr. at 182). His condition does not affect his ability to squat, bend, walk, kneel, talk, climb stairs, see, concentrate, understand, follow instructions, or get along with others. He is able to finish what he starts and can follow written and spoken instructions

## B.    SUMMARY OF MEDICAL RECORDS

December 31, 2003, was plaintiff's original alleged onset date of disability. He amended it to September 17, 2008 -- the day he filed for benefits.

On October 8, 2008, plaintiff was evaluated by Thomas Corsolini, M.D. (Tr. at 219). Plaintiff complained of chronic numbness in both hands for the past five years and persistent pain in his neck that causes right sided headaches. "He attributes his problems to a 30 foot fall that occurred in 1978 while on a job in Illinois. He had a fracture of each wrist and the right wrist required open reduction with internal fixation. He said he did receive a settlement for those injuries." Plaintiff is a long-time smoker. "He doesn't receive any medical treatment and takes no prescription medications."

"He is pleasant and cooperative, but has visual appearance that would be consistent with long time smoking and drinking. He acknowledges that he has had a DUI which currently makes him a non-driver." On exam plaintiff had normal range of motion in all joints including his neck and head, except flexion at each wrist was limited

to about 30 degrees, extension to 70 degrees.  He had no evidence of muscle atrophy.

Straight leg raising was negative, he could walk smoothly without limp or hesitation, he

could squat independently.  Dr. Corsolini found that plaintiff had "symptoms" compatible

with carpal tunnel syndrome as well as "some physical findings" that would support that,

and that it would be a feasible diagnosis given the history of old fracture at each wrist.

"He may also have degenerative changes in his cervical spine producing the symptoms

he describes."

On October 13, 2008, plaintiff saw William Graham, M.D. for neck and wrist pain

(Tr. at 251-252).  "Pt. has an alcohol odor about himself. He denies having any alcohol

today but states he and his brother drank a lot of alcohol yesterday."  Plaintiff was

smoking one pack of cigarettes per day, reported living with his parents, and "currently

on disability [and] currently applying for disability and has seen a doctor to sign

paperwork."  On exam, Dr. Graham found that plaintiff was normal, well-appearing,

alert, active.  His neck has normal range of motion but produced pain when rotating to

the left and with his chin touching his chest.  Dr. Graham prescribed Fioricet[2] for pain.

On November 10, 2008, plaintiff saw Dr. Graham for a follow up (Tr. at 253).

Plaintiff reported no significant improvement in his headaches with Fioricet.  Plaintiff

was "not feeling tired or poorly."  He was alert, oriented, in no acute distress.  Plaintiff

was diagnosed with carpal tunnel syndrome and cervicalgia (neck pain).

On February 2, 2009, plaintiff saw Dr. Graham for a follow up (Tr. at 255).

Plaintiff reported improvement in his carpal tunnel syndrome symptoms although the

---

[2]Acetaminophen (Tylenol), Butalbital (barbiturate) and Caffeine combined.

8

numbness did persist. Plaintiff's only medication at the time was for high blood pressure (Tr. at 255).

On February 23, 2009, plaintiff saw Erin Greer, M.D., an orthopedist (Tr. at 224, 258-260). Plaintiff reported no anxiety or depression (Tr. at 259). She observed that he was pleasant and cooperative, fully oriented, had appropriate muscle tone, and normal strength throughout. Her examination showed that plaintiff had normal gait and normal range of motion in his upper extremities. Despite his wrist deformities, his range of motion was "actually quite good." After EMG studies confirmed carpal tunnel syndrome in both plaintiff's wrists, plaintiff had left-hand carpal tunnel release surgery on April 8, 2009 (Tr. at 221-222, 269). Two weeks later, plaintiff told Dr. Greer that he was "very happy" with the results of the surgery, and that his numbness and tingling were much improved (Tr. at 235).

On March 27, 2009, plaintiff saw Dr. Greer and reported no anxiety, depression or sleeping problems (Tr. at 265). Plaintiff was pleasant and cooperative, alert and fully oriented.

On May 13, 2009, plaintiff saw Dr. Greer and reported that he was not feeling tired or poorly (Tr. at 261). He was smoking cigarettes, "drinking in moderation," not exercising regularly, "currently on disability and not using seatbelts."

On July 14, 2009, plaintiff had cervical facet blocks in his neck performed by Jay Baker, D.O. (Tr. at 242-243). Plaintiff reported taking Fioricet for pain -- "at times he will take 3-4 at a time and then drink either a 6-pack of a 12-pack of beer even though he knows this is not supposed to be done." Plaintiff was on no medication other than

Fioricet.  X-rays showed extensive spondylosis[3] at the C5-6 and C6-7 level.  On exam he was alert and oriented and in no acute distress.  He maintained eye contact with appropriate affect.  Plaintiff's physical exam (including grip strength) was normal except pain on palpation at the base of the neck.  After the cervical facet blocks, plaintiff was told to return in three to four weeks.

On August 12, 2009, plaintiff saw Dr. Baker for a follow up (Tr. at 244).  He complained of no significant relief from the injections.  "We explained to him that if we do decide to place him on pain medication that he cannot drink; he has been in the past."  Plaintiff was told not to obtain pain medication from other providers, and he was told to have a psychological evaluation.  Dr. Baker prescribed hydrocodone, a narcotic.

On September 9, 2009, plaintiff saw Lavon Orrell, physician's assistant in Dr. Baker's office (Tr. at 245).  "He is reporting approximately 70% to 80% relief with his current medication regimen and denies any questions or concerns today."  Plaintiff's prescription for Norco (narcotic) was refilled.

On October 6, 2009, plaintiff saw Lavon Orrell for a follow up (Tr. at 246, 262).  He reported his head and neck pain was a 9 out of 10 and constant.  Despite that report, the note says, "He is reporting 70% to 75% relief with his current medication regimen and notes that he had a recent sinus infection."  Plaintiff was continued on his same medication and dose.

On November 3, 2009, plaintiff saw Dr. Baker for a follow up (Tr. at 247).  Plaintiff reported neck pain rated a 7 out of 10, yet the report says, "He also reports 70% relief

_____

[3]Abnormal wear on the cartilage and bones of the neck.

10

with his oral medications." He was told to take four Norco tablets a day instead of three.

On December 1, 2009, plaintiff saw Dr. Baker for a follow up (Tr. at 248) Plaintiff's pain was described as a 5 out of 10. "He was helping his father cut wood." His medication was continued without change.

On December 29, 2009, plaintiff saw Lavon Orrell for a follow up (Tr. at 249). Plaintiff described his pain as a 5-6 out of 10 and said that it is made worse by splitting wood. Plaintiff reported some difficulty with his depression recently, as he had been snapping at his seven-year-old child. He asked to be started on an antidepressant. Mr. Orrell continued plaintiff on his same pain medication and prescribed Cymbalta, an antidepressant.

Plaintiff saw William Myers, Psy.D., at Ozarks hospital on January 25, 2010, for a 46-minute visit (Tr. at 272-274, 281). Plaintiff told the doctor that he had first experienced symptoms of depression two months earlier, which he attributed to frustration over his physical limitations; and he admitted he did not have any previous psychiatric treatment history. Dr. Myers commented that plaintiff "described classic symptoms of depression he characterizes as relatively mild at the present time." He described decreased pleasure and interest in activities, intermittent problems sleeping, lack of energy, diminished frustration tolerance, and "some problems focusing" attention and concentration. Dr. Myers's mental status examination revealed that plaintiff was alert and responsive, and he was able to adequately maintain attention. His long term memory was functioning, though plaintiff was often vague with details. Similarly, his thought process was "somewhat underproductive, but coherent and relevant to topics of

11

conversation." He also had some difficulty with comprehending instructions, requiring some prompting and review.

On February 8, 2010, plaintiff's administrative hearing was held before an administrative law judge.

Records produced after the ALJ's decision show that plaintiff saw Dr. Myers for a one-time follow-up on February 23, 2010, for a therapy session (Tr. at 281). Plaintiff complained of increased irritability, and Dr. Myers went over relaxation techniques and "appropriately pacing physical activities."

The next month, on March 17, 2010, Dr. Myers completed a Medical Source Statement - Mental (Tr. at 284-285). He found that plaintiff has not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

12

He found that plaintiff was only moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

Dr. Myers did not find that plaintiff was markedly limited in any category (Tr. at 284-285).

When asked if plaintiff could understand, remember and carry out simple instructions on a sustained basis, he checked, "yes" (Tr. at 285). He also indicated that plaintiff could make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions, and deal with changes in a routine work setting on a sustained basis (Tr. at 285). However, he stated that defendant could not "respond appropriately to supervision, co-workers, and usual work situations" on a

sustained basis.  There is no elaboration -- the form is merely one that requires putting

Xs in boxes.

On April 7, 2010, Paul Dobard, M.D., performed a psychiatric evaluation (Tr. at

294-295).  Plaintiff said he was having "some real difficulties with reemerging

depression."  Plaintiff said he felt like a failure because he could not provide for his

family since he fell in 1978.  Plaintiff said that if he does not overdo it, his medication

manages his physical symptoms.

> He states, though, that at times he does overdo it, but not intentionally, especially
> where his parents are concerned. They are in their 70s. They heat with wood,
> and he states that neither of them is physically able to split wood or chop down
> any type of trees.

Plaintiff said it was hard to say no to his parents.

His current medications consisted of hydrocodone (narcotic) and Flexeril (muscle

relaxer).  He drinks beer on occasion but not to excess.  He smokes 3/4 pack of

cigarettes daily.

Plaintiff was alert and oriented times three, appropriately dressed, and made

good eye contact.  He appeared sad and repeated himself frequently during the

evaluation.  He was hard on himself and "always believes he should do more."  His

insight, judgment and IQ were fair.  The diagnoses were, "Rule out major depression,

recurrent, mild" and "Rule out organic mood disorder with disturbance of mood

secondary to head injury."  Dr. Dobard recommended that plaintiff take over-the-counter

ibuprofen when he knows he is going to do something strenuous like chopping wood

and recommended that plaintiff ask his brother to help out more with their parents'

14

chores. He prescribed Remeron, an antidepressant, and told plaintiff to follow up in three months.

**C.    SUMMARY OF TESTIMONY**

During the February 8, 2010, hearing, plaintiff testified; and Terri Crawford, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff is five feet ten inches tall and weighs 187 pounds (Tr. at 31). Plaintiff testified that his treating physicians are Dr. Baker, whom he had been seeing for seven or eight months for head and neck pain, and Dr. Waller, whom he had been seeing monthly for the past seven months for nerves (Tr. at 27-28). Seeing Dr. Waller has been helping (Tr. at 35). Dr. Baker gives plaintiff his anxiety medication; he sees Dr. Waller for counseling (Tr. at 28). Dr. Baker recommended that plaintiff see Dr. Waller for counseling because "that's just something he expects his pain clinic patients to do" (Tr. at 35). Plaintiff has been on Cymbalta for depression for about one month (Tr. at 38).

Plaintiff is unable to work because he cannot stay focused on one specific thing due to constant pain in his neck and head (Tr. at 28). Plaintiff has very bad headaches which began between one and two years ago (Tr. at 28). In 1978 he fell 30 feet and then started getting "real bad headaches a few years back." He learned he has "massive arthritis" in his neck (Tr. at 28). His pain goes into the top of his shoulder blades (Tr. at 30).

Plaintiff cannot sit, stand or walk for more than 15 to 20 minutes (Tr. at 33).

Plaintiff cannot bend his hands, and he lost the feeling in his fingertips (Tr. at 29). When the ALJ pointed out that he had watched plaintiff bend his hands and move his fingers, plaintiff said, "Well, my hands, okay. I'm sorry." (Tr. at 29). Plaintiff cannot grasp or hold onto anything (Tr. at 29). For example, he has a hard time holding onto a bolt to screw it in when he is trying to fix a car (Tr. at 29).

> A.   I just can't grasp and hold onto anything.
>
> Q.   Give me an example.
>
> A.   Trying to put a bolt, something in a car to fix a car, or, I have a hard time holding onto the bolt to screw it in.
>
> Q.   Okay. So, and you can't do it at all, or does it take you longer, or what?
>
> A.   Well, it takes me a lot longer.

(Tr. at 29-30).

Plaintiff has trouble picking up a gallon of milk and pouring it because he has no strength in either hand (Tr. at 30). He could pick up a half a gallon of milk with one hand (Tr. at 31). When the ALJ pointed out that plaintiff testified he could fix a car which seems inconsistent with his inability to lift, plaintiff said:

> A.   I don't, I can't do that no more,
>
> Q.   Well, when was the last time you had trouble putting the bolt in you told me about in the car, where you can't put the bolt in. When did that happen?
>
> A.   Probably four years ago.
>
> Q.   Four years ago?
>
> A.   Right.

(Tr. at 31).

16

Plaintiff injured his wrists in 1977 or 1978 (Tr. at 40). He had surgery on his right wrist in about 1979 (Tr. at 40). He had carpel tunnel surgery on his left wrist in April 2009 (Tr. at 40). After that he had "a little bit" of improvement in his symptoms, but the pain, numbness and tingling are coming back (Tr. at 40). For a "short period of time" following his surgery he had a lot of relief (Tr. at 41). Plaintiff can grip, grasp and handle "occasionally," or 10 to 15 minutes at a time before he would need to rest for 15 to 20 minutes (Tr. at 41).

Plaintiff has been a smoker for 40 years (Tr. at 36). He has made an effort to reduce his smoking, and he has gone from about two packs a day down to three-quarters of a pack a day (Tr. at 36). Plaintiff has had shortness of breath for eight to ten years, and it has gotten worse (Tr. at 36). Physical activity like walking short distances causes plaintiff to be short of breath (Tr. at 36). Humidity and extreme heat or cold makes it worse (Tr. at 37). Plaintiff has received no treatment for these symptoms (Tr. at 37).

Plaintiff has trouble with his hearing, but last had his hearing checked 15 years ago (Tr. at 38). Plaintiff testified that he "occasionally" has trouble sleeping due to pain; when asked, "Well, what does that mean? Is it every night, or not every night?" plaintiff said, "It would be every night, then." (Tr. at 39). Plaintiff is tired during the day because of trouble sleeping, headaches, and pain (Tr. at 39).

Plaintiff lies down once or twice a day for an hour or two at a time due to pain and fatigue (Tr. at 41-42). Although Dr. Baker's records state that plaintiff's pain relief was anywhere from 50 to 85% with his medication, plaintiff testified that he gets about 50% pain relief with his medicine (Tr. at 43).

17

> Q.    What about these other times, where he says you're getting better relief?
>
> A.    The way I talk to him is when he describes it to me, it's just right after I've taken my medication. So I'm getting relief at that time when I'm talking to him.

(Tr. at 43). The pain relief does not last (Tr. at 44). Dr. Baker performed injections which helped "for a very short period of time" (Tr. at 44). Plaintiff takes Hydrocodone for his pain, and he experiences no side effects (Tr. at 44).

Plaintiff's girl friend does the chores around the house (Tr. at 45). Plaintiff can sometimes "get out maybe once in a while, rake a leaf, or something to that effect in the fall." (Tr. at 45). He rakes leaves about once a week for about 10 to 15 minutes at a time (Tr. at 45-46). He has to stop after 10 to 15 minutes because he runs out of breath, his neck starts hurting, and he gets a headache (Tr. at 46).

Plaintiff does not drive because his license was revoked in approximately 1997 for DWI (Tr. at 31-32, 34). Plaintiff's girlfriend drives him around (Tr. at 32). She is a stay-at-home mom (Tr. at 32). The family lives off plaintiff's seven-year-old son's SSI income -- the son has ADHD (Tr. at 32, 33). The family is on Medicaid (Tr. at 33). The son walks to school and is doing "real good" in school (Tr. at 33). Plaintiff drinks occasionally -- three or four beers six or seven times a month (Tr. at 48). Plaintiff's doctors have warned him about using alcohol with his narcotic medication (Tr. at 48). When asked if he is an alcoholic, plaintiff said, "Oh, yes. Yes." (Tr. at 49). That is why he cannot drink very much (Tr. at 49).

At the conclusion of plaintiff's testimony, the ALJ went over all of his alleged impairments and asked plaintiff's attorney if there were any more.

ATTY:      He's prescribed Cymbalta for depression, so I think depression is there, although we don't have a psych eval.  I imagine there's a diagnosis that's similar.

ALJ:       Actually, I saw that.  And I looked for it. But the Cymbalta can be done, can be used for a number of conditions, not necessarily mental...

ATTY:      I guess I'm assuming...

ALJ:       There may be an underlying mental disorder to explain the alcoholism. But you're correct.  We don't have anything, and if he had been seeing this gentleman for eight months I thought there'd be something.  But I didn't see anything.

(Tr. at 51).

## 2.  Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could do light work but could not perform repetitive neck flexion.[4]  The person could frequently bend, twist, and turn.  The person could occasionally stoop, squat, and climb; he could crawl and kneel if he dropped something but not as part of his job duties (Tr. at 56-57).  He could not reach bilaterally over the head; he could frequently grip, grasp, handle, finger and feel; he could not use motor vehicles or vibrating tools; work at unprotected heights; or work in

---

[4]"This would have to be a movement that continued constantly for not less than five minutes.  It would involve the movement from three points:  A to B to A. That constitutes a repetition.  Or from A to B to C, A to B to D, any movement that has three specific points. That movement would be at a speed of two seconds or faster, two seconds or less.  So that the movement from A to B to C, it would take two seconds to go from the initial movement to the second position, and then conclude the movement. And that would have to be sustained in constant movement for five minutes or more." (Tr. at 56).

19

heavy concentrations of dust, smoke or fumes (Tr. at 57). He could not work at temperature extremes of cold, heat, or humidity (Tr. at 57).

The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 57). The person could perform unskilled jobs such as office helper, DOT 239.567-010, with 165,000 jobs in the country, and 3,200 in Missouri; sales attendant, DOT 299.677-010, with 182,000 in the country and 3,700 in Missouri; or production assembler, DOT 706.687-010, with 54,000 in the country and 1,000 in Missouri (Tr. at 58).

The second hypothetical is the same as the first except gripping and grasping movements involving the wrists, palm and fingers could only be performed occasionally (Tr. at 58). The vocational expert testified that such a person could work as an usher, DOT 344.677-014, with 53,000 jobs in the country and 1,100 in Missouri; an information clerk, DOT 237.367-022, with 110,000 in the country and 1,300 in Missouri; or a figure server counter clerk, DOT 249.366-010, with 55,000 in the country and 1,300 in Missouri (Tr. at 59).

The third hypothetical is that same as the first except the person has a marked limitation in the ability to perform work at the SVP 3 through 9 levels (Tr. at 59). The vocational expert testified that the person could still do the same jobs because those are all SVP 2 (Tr. at 59).

The next hypothetical added to the second one a mild limitation on the ability to understand, remember, and carry out short, simple instructions or make judgments on simple work-related decisions (Tr. at 59). The vocational expert testified that this additional limitation would not change the available jobs (Tr. at 59).

The next hypothetical is the same as the second except the person has marked limitations in his ability to understand, remember and carry out short, simple instructions; to make judgements on simple work-related decisions; and carry out complex instructions (Tr. at 59). The vocational expert testified that such a person could not work (Tr. at 60).

The next hypothetical involved a person who could perform no more than sedentary work and could only occasionally grip, grasp, and handle (Tr. at 60). The vocational expert testified that such a person could not work (Tr. at 60).

The next hypothetical involved a person who had to change positions from sitting, to standing to walking every 15 to 20 minutes and needs a 15 to 20 minute break after walking (Tr. at 60). The vocational expert testified that such a person could not work (Tr. at 60).

The final hypothetical involved a person who needs to lie down during the work day for up to two hours (Tr. at 60). Not surprisingly, the vocational expert testified that such a person could not work (Tr. at 60).

**V.    FINDINGS OF THE ALJ**

Administrative Law Judge James Francis Gillet entered his opinion on February 22, 2010 (Tr. at 14-22).

Step one. Plaintiff has not engaged in substantial gainful activity since his application date (Tr. at 16).

Step two. Plaintiff has the following severe impairments: cervical spondylosis with headaches, bilateral carpal tunnel syndrome, history of right wrist fracture, alcohol and nicotine addiction (Tr. at 16). Plaintiff's mental impairment is not severe (Tr. at 16-

21

17).  His alleged hearing loss and urinary problems are not medically determinable impairments (Tr. at 17).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17).

Step four.  Plaintiff's subjective allegations are not credible (Tr. at 18-20).  He retains the residual functional capacity to perform light work except he cannot perform repetitive neck flexion; he can frequently bend, twist, and turn; he cannot crawl or kneel as part of a job duty; he can occasionally stoop, squat and climb; he cannot reach bilaterally above the head; he can occasionally perform gripping and grasping movements that involve the wrists, palm and fingers; he cannot work at unprotected heights; in heavy concentrations of dust, smoke or fumes, or at temperatures extremes of cold, heat or humidity (Tr. at 18).  With this residual functional capacity, plaintiff cannot return to his past relevant work as a construction worker II, construction worker I, or industrial truck operator (Tr. at 20).

Step five.  Plaintiff can work as an usher, an information clerk, or a counter clerk, all of which are available in significant numbers in the national economy (Tr. at 21-22).  Therefore, plaintiff is not disabled.

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because the ALJ's summary of plaintiff's daily activities does not match the evidence of record.  "Even though the ALJ cited questionnaires completed by the Plaintiff, he failed to recognize the challenges and limitations the Plaintiff must endure regarding these daily activities."

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other

23

symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

Mr. Ervin has alleged that he suffers from chronic pain in his neck and wrists. The neck pain also causes headaches and tension in his neck. He alleged that he is unable to bend or use his hands and is unable to grasp or hold objects. He testified that he was unable to pick up a gallon of milk with one hand. He testified that he has difficulty sitting, standing or walking for more than 15-20 minutes at a time. He alleged that he suffered from shortness of breath from smoking cigarettes. He testified that his chronic pain affects his sleep, resulting in fatigue during the day.

The medical basis which supports the degree of severity of subjective complaints alleged is one factor to be considered in evaluating the credibility of the testimony and complaints. . . .

The claimant's reported activities of daily living are inconsistent with total debilitation. The claimant reported that he was able to chop wood in December 2009. The claimant is apparently able to care for his young son at home, which can be quite demanding both physically and emotionally, without any particular assistance. He is able to prepare his own meals and can provide his own personal care. He watches television, spends time outside with his son, cooks on an outdoor grill and goes camping.

There is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments. A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments.

In terms of the claimant's alleged neck pain and accompanying headaches, the record does show that the claimant has been diagnosed with cervical spondylosis. A cervical x-ray showed extensive spondylosis at C5-6 and C6-7. The claimant has received fairly consistent treatment for neck pain and headaches since October 2008. However, the claimant has received largely conservative treatment. Mr. Ervin received treatment at a pain clinic with Jay Baker, M.D. Dr. Baker treated the claimant with cervical facet blocks and narcotic pain medications. Dr. Baker has not recommended physical therapy,

surgery or hospitalization for the impairment. The doctor has not imposed any restrictions on the claimant. An October 2008 consultative examination by Thomas Corsolini, M.D., contained observations of normal head and neck range of motion and subsequent treatment providers have not noted significant loss of range of motion in the head or neck.

* * * * *

With respect to the allegations relating to the wrist impairments, the record is inconsistent with total debilitation. The claimant suffered an injury in the 1970s when he fractured his wrist and has residual deformity from that incident. Following the incident, the claimant was able to work at SGA levels.  In October 2008, the claimant reported numbness and tingling in his wrists and hands, was diagnosed with carpal tunnel syndrome and limited range of motion was noted in the wrists. The claimant treated with orthopedist Erin Greer, M.D., in February 2009 for the condition.  Dr. Greer opined that the claimant had severe bilateral carpal tunnel syndrome and recommended left carpal tunnel release. The surgery was performed in April 2009. Following the surgery, the claimant reported that he was "very happy" with the results and that the numbness and tingling were much improved. The claimant was told to return if he had problems and also to consider right carpal tunnel surgery in the future.  The claimant has not returned for treatment since this visit, suggesting that the surgery was successful in resolving his symptoms. The absence of treatment since April 2009 also suggests that the remaining carpal tunnel in his right hand is not as debilitating as alleged, otherwise he would have returned to Dr. Greer for treatment.

While the wrist impairments are not as debilitating as alleged, the claimant does have some limitations. The claimant can only occasionally perform gripping and grasping movements that involve the wrists, palm and fingers. The claimant cannot work at unprotected heights.

The claimant alleged that his chronic pain results in difficulty sleeping and that he is often fatigued during the day. In November 2009, the claimant told Dr. Baker he was waking up in the middle of the night with headaches.  The doctor adjusted the claimant's medications, and the claimant did not report difficulties with sleep in subsequent visits, suggesting the increase in medication was effective.  Moreover, the claimant did not report the symptoms of daytime fatigue because of nighttime pain to his treatment providers. This allegation of fatigue due to disrupted sleep is not supported by the record.

(Tr. at 18-20).

An ALJ may not disregard a claimant's subjective complaints based solely on

lack of objective evidence, but he may disbelieve a claimant based on inherent

25

inconsistencies between the claimant's complaints and other evidence.  Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) (ALJ may not disregard subjective complaints merely because there is no evidence to support the complaints, but may disbelieve subjective reports because of inherent inconsistencies or other circumstances.)

Here, the ALJ pointed out that plaintiff claimed he could stand and walk no more than a few minutes at a time, that he was unable to lift an eight-pound gallon of milk, and that he had to lie down several times per day; however, plaintiff's medical records were not consistent with these alleged limitations. For example, plaintiff received mostly conservative treatment. No doctor suggested plaintiff needed further back or neck surgery, and he was never told to participate in physical therapy.  Certainly if plaintiff were as limited as he claimed, to the extent that he could stand no more than a few minutes and had to lie down much of the day, one would expect much more intense medical health care.

Plaintiff's medical records are inconsistent with his alleged severe limitations. Although he said he was unable to move about or lift, his examinations were basically unremarkable. He demonstrated little difficulty moving about or displaying full strength. Dr. Corsolini noted that plaintiff had normal range of motion and that he could walk "smoothly."  Dr. Greer, an orthopedic doctor, observed that plaintiff had normal gait and normal strength in both his arms and his legs.  Plaintiff told Dr. Greer that he was "very happy" with the results of carpal tunnel release surgery.  Although plaintiff was offered carpal tunnel release surgery for his other hand, it does not appear he ever requested the surgery. Plaintiff testified he had profound difficulty sleeping, but as the ALJ pointed

out, plaintiff made little mention of difficulty sleeping to his doctors. Plaintiff was never put on medication for sleep other than on one occasion when his pain medication was increased to four tablets a day from three so that he could take a pill before bedtime.

None of plaintiff's medical doctors told him to limit his physical activity during the relevant period, nor did any medical provider suggest that plaintiff had limitations consistent with disability. A lack of significant restrictions im posed by treating doctors supports an ALJ's decision that a claimant is not disabled. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir.1996)).

The ALJ also pointed out that plaintiff had a poor work history and that he had worked only sporadically prior to his alleged onset date. The Eighth Circuit has noted that "a lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir.1993) (claimant's credibility is lessened by a poor work history)).

Finally, in this context, the ALJ pointed out that plaintiff's daily activities were inconsistent with his claimed limitations. For example, plaintiff said he chopped down trees and split wood for his elderly parents because they heated their home with wood and it was difficult to say no to them. Although plaintiff now argues that he never admitted to actually chopping down trees or splitting wood but only "helped," that argument is not plausible. Plaintiff told Dr. Baker on December 1, 2009, that he helped his father chop wood. He told Lavon Orrell on December 29, 2009, that his symptoms were worse by splitting wood. If he were not actually performing this activity, it would make no sense to say something like this to the physician's assistant. On April 7, 2010,

27

plaintiff said to Dr. Dobard that it was hard to say no to his parents regarding chopping and splitting wood, and Dr. Dobard told plaintiff to take over-the-counter ibuprofen when he was going to be doing a strenuous activity like chopping wood. He also recommended plaintiff ask his brother to help him with this. It is completely unbelievable that all three of these medical professionals on three different occasions would misinterpret plaintiff's statements and conclude that he was chopping and splitting wood when he really was not. As the ALJ pointed out, it is unlikely plaintiff would have attempted such an activity if he were really as limited as he claimed during the hearing.

The ALJ also pointed out that plaintiff cared for his young son, prepared his own meals, and performed other simple household tasks. The ALJ not only may but should consider a claimant's daily activities as part of the credibility assessment. Curran-Kicksey v. Barnhart, 315 F.3d 946, 969 (8th Cir. 2003) ("Although participation in these activities does not dispositively show that Ms. Curran-Kicksey's complaints of pain were exaggerated, they certainly were appropriate matters for the ALJ to consider under Polaski."). While plaintiff's daily activities might not have been determinative in this case, they still suggested plaintiff retained the capacity for the types of light work described by his residual functional capacity. See Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009) (cases send "mixed signals" about the importance of daily activities, but under caselaw and the regulations, it is appropriate for the ALJ to cite activities). Finally, the fact that plaintiff later disclaimed activities did not bar the ALJ from considering them. Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996) (although if accepted as true, plaintiff's daily activities show some limitations, the ALJ is not

28

required to believe all of a claimant's assertions concerning his activities).

Together with medical opinions and plaintiff's conservative treatment, plaintiff's daily activities were an appropriate factor for the ALJ to consider, notwithstanding plaintiff's sometimes conflicting testimony regarding his capabilities. The ALJ properly cited them as part of his credibility assessment.

After considering all of the appropriate credibility factors, the ALJ found that plaintiff's alleged disabling symptoms were not entirely credible. The substantial evidence in the record as a whole supports that finding.

## VII. PLAINTIFF'S MENTAL IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that his mental impairment was not severe. The ALJ had this to say about plaintiff's mental impairment:

> In December 2009, the claimant mentioned that he was concerned with depression, mainly as a result of his pain and physical impairments. The claimant started on an antidepressant and [was] referred to William G. Myers, Psy.D., who assessed the claimant in January 2010. Dr. Myers diagnosed the claimant with major depressive disorder, single episode, mild, as well as alcohol dependence and nicotine dependence. Dr. Myers observed the claimant was alert, responsive and oriented with intact memory functioning. He noted the claimant's mood as relatively euthymic [normal] and that the mood was appropriate. In this evaluation, the claimant described the symptoms as starting only two months earlier and characterized the symptoms as "relatively mild." The claimant has only begun treatment for this condition and there is little indication that these "relatively mild" symptoms will not resolve within 12 months. The claimant's medically determinable mental impairment of major depressive disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

> In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. These four broad functional areas are known as the "paragraph B" criteria.

> In activities of daily living, the claimant has mild restriction. He lives with his girlfriend and son, but there is no evidence that he does not care for his personal

29

needs. He is able to manage his affairs independently. In social functioning, the claimant has mild restriction. He lives amiably with family members and has no history of job loss or legal difficulties related to interpersonal conflict. With regard to concentration, persistence or pace, the claimant has mild restriction. No physician has documented the claimant's inability to stay focused on a task, as he alleged at the hearing. Dr. Myers observed the claimant had some difficulty "comprehending instructions mediating this examination" but assessed the claimant had intact memory functioning and did not note an inability to complete the tasks. As for episodes of decompensation, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere.

(Tr. at 16-17).

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)     Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1)     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)     Capacities for seeing, hearing, and speaking;

(3)     Understanding, carrying out, and remembering simple instructions;

(4)     Use of judgment;

(5)     Responding appropriately to supervision, co-workers and usual work situations; and

(6)     Dealing with changes in a routine work setting.

The step-two burden is not onerous, but it is not toothless either.  Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007).  The fact that a claimant was diagnosed with or treated for a mental or emotional impairment does not automatically mean that the impairment is severe.  Buckner v. Astrue, 646 F.3d 549, 557 (8th Cir. 2011).  When, as here, mental impairments are involved, the ALJ analyzes the claimant's ability to function in four general domains: daily living; social functioning; concentration, persistence and pace; and episodes of decompensation. 20 C.F.R. § 416.920a.  If the ALJ finds that the claimant has no more than mild limitations in each domain, he will find the mental impairments nonsevere.  20 C.F.R. § 416.920a(c)(3) and (d)(1); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C (2011);  Buckner v. Astrue, 646 F.3d at 557. In addition, the ALJ found that plaintiff had never suffered decompensation of extended duration, which is defined as a loss of functioning requiring treatment like hospitalization or an increase in medication for an extended period.

Evidence available to the ALJ did not reveal mental impairments sufficient enough to cause plaintiff any work-related limitations. During the majority of the relevant period, plaintiff had essentially no mental health complaints at all. He did not complain of symptoms until just weeks before his hearing with the ALJ.  See Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (affirming ALJ's determination that mental issues were not severe where claimant sought very limited treatment, and such treatment was primarily for the purpose of obtaining benefits). Even then, he had only one mental

31

health visit, with Dr. Myers, a few weeks before his hearing. Plaintiff told the doctor that his symptoms had started fairly recently, just two months earlier. Plaintiff described fairly minor symptoms, like lack of energy and "some problems" with focus, and Dr. Myers characterized plaintiff's depression as "mild." His mental status examination did not cite any difficulty with concentration -- plaintiff was alert and responsive and was able to maintain attention. He had some difficulty with instruction, but was able to comply after prompting and review by the doctor.

Significantly, these allegations and findings are not supported by the remainder of the record, including plaintiff's administrative paperwork. During plaintiff's visits with Dr. Graham, Dr. Greer, and Dr. Baker, those doctors observed that plaintiff was alert, oriented, pleasant, cooperative, and fully responsive. Plaintiff told Dr. Greer on several occasions that he had no anxiety or depression, and he also denied sleeping problems. At the time of the ALJ's decision, plaintiff had only been taking Cymbalta for one month; and that medication was prescribed after plaintiff asked for an antidepressant.

In his administrative paperwork, plaintiff reported that all of his symptoms are due to numbness in his hands and arms. He never alleged any mental symptoms. In a Function Report completed on September 21, 2008, plaintiff indicated he had no difficulty with understanding, following instructions, or getting along with others. In a Function Report completed on March 26, 2009, plaintiff indicated he had no difficulty with concentrating, understanding, following instructions, or getting along with others. He said he is able to finish what he starts and can follow written and spoken instructions.

Dr. Myers performed a mental status examination and found that plaintiff was able to maintain adequate attention.

Plaintiff argues that he has had a Cymbalta prescription since December 2009, that consultative psychologist William Myers, Psy.D., suggested he had "moderate" mental health symptoms, and that he sought treatment from a psychiatrist, Paul Dobard, M.D. He says these medical records make it "abundantly clear" that he meets the fairly minimal threshold standard at step two. This argument is without merit. Having a prescription for an antidepressant is not enough for plaintiff to carry his burden at step two of the sequential analysis. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (prescription of antidepressant drugs does not show that the claimant is disabled). As discussed above, the fact plaintiff has been medicated provides no evidence that he has any work-related limitations. In fact, it is just as significant that plaintiff did not get his prescription until shortly before the ALJ's hearing on his case.

Additionally, most of the evidence plaintiff cites, particularly Dr. Myers's medical source statement and Dr. Dobard's single treatment note, was not in existence at the time the ALJ rendered his decision in the case. Evidence like this, which has been submitted to the Appeals Council after the ALJ's decision, counts as part of the record on review at the district court level. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) ("Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence."). However, the fact that the evidence must be considered does not make it automatically relevant to the ALJ's decision.

Both Dr. Myers's report and Dr. Dobard's report were dated after ALJ's decision, and were thus not relevant to plaintiff's mental health during the relevant period. Sullins v. Shalala, 25 F.3d 601, 604-05 (8th Cir. 1994) (psychiatric report dated one month after the ALJ's decision was too late to be considered). Dr. Myers's form, completed about a month after the ALJ issued his decision, did not indicate that the suggested limitations were present during the relevant time period. Dr. Dobard's examination, completed a few weeks later, dealt with plaintiff's current functioning and similarly does not purport to express any opinion about plaintiff's functioning during the relevant period.

Even if the evidence had pertained to the proper time period, the Appeals Council correctly concluded that neither doctors' evidence justified disturbing the ALJ's decision. The Appeals Council pointed out that Dr. Myers's mental source statement deserved little weight since he "did not provide supporting documentation in support of his assessed limitation" and because plaintiff had "only seen Dr. Myers twice." 20 C.F.R § 416.927(c)(2); Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) (even an experienced treating physician can be given less weight if his opinion is not supported and/or is inconsistent with other evidence in the record).

Dr. Myers had only seen plaintiff two times before completing the medical source statement. His opinion therefore did not carry the kind of weight that would have been afforded a more experienced treating physician. Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) ("Vega's March letter . . . is not entitled to controlling weight as a medical opinion of a treating source. When she filled out the checklist, Vega had only met with Randolph on three prior occasions.") (citation omitted).

34

Furthermore, and more importantly, Dr. Myers's medical source statement was not consistent with his own findings or with the remainder of the record. Dr. Myers's treatment notes, as discussed above, cited no serious limitations in plaintiff's concentration, and there was no reason to believe that plaintiff could not get along with coworkers and the general public. "Moderate" limitations in either area certainly would have resulted in significant clinical findings, or evidence of conflicts with other people, but plaintiff's record shows evidence of neither. A check-off form is properly discounted when it is inconsistent with the doctor's own notes, which "reported no findings of significant limitation or inability to work." Teague v. Astrue, 638 F.3d 611, 615-16 (8th Cir. 2011) . It is also noteworthy that Dr. Myers's form was produced after the ALJ's unfavorable decision. See Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989) (doctor's opinion solicited after the ALJ's negative decision is less convincing).

Dr. Dobard also only saw plaintiff a single time and not until after the end of the period at issue. His report is not relevant. Even if the report had been timely, it would not have changed the ALJ's decision. The report indicates Dr. Dobard had some areas of concern about plaintiff, but his mental status examination did not find any problems that were obviously inconsistent with the ability to perform simple work. Dr. Dobard observed that plaintiff repeated himself more than was necessary, appeared sad, and was "hard on himself," but repeating oneself and being sad are not work-related limitations. The doctor otherwise noted plaintiff's insight and judgment were fair, and his IQ appeared to be average.

Finally, I note that the ALJ asked the vocational expert whether a person of plaintiff's characteristics could work if he had a mild limitation in his ability to

understand, remember, and carry out short, simple instructions and make judgments in simple work-related decisions.  The vocational expert testified that these mental limitations would not have any impact on plaintiff's ability to return to work.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's mental impairment is not severe.

## VIII.    RELIANCE ON VOCATIONAL EXPERT TESTIMONY

Plaintiff's final argument is that the ALJ erred in relying on vocational expert testimony rather than finding plaintiff disabled under the medical-vocational guidelines. Plaintiff argues that his gripping and grasping limitations preclude light work and if he were therefore limited to performing sedentary work, the guidelines would have directing a finding of disabled for a person of plaintiff's age, education and work experience.

The mere inability to perform the full range of work at one exertional level does not require the ALJ to find the claimant limited to the next lower exertional level.  The regulations provide that claimants whose residual functional capacity places them between two different exertional levels should nearly always get the benefit of vocational expert testimony tailored to their specific residual functional capacity.

> In situations where the rules would direct different conclusions and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability.  Accordingly, VS [or vocational expert] assistance is advisable for these types of cases.

See Social Security Ruling 83-12. Here, as noted above, the vocational expert testified to plaintiff's ability to perform work based on his specific residual functional capacity and vocational profile.  The ALJ was not required to resort to nonspecific medical-vocational

36

guidelines.  <u>Boone v. Barnhart</u>, 353 F.3d 203 (3rd Cir. 2003) (it was appropriate for the ALJ to rely on a vocational expert for "individualized analysis" when the claimant has a residual functional capacity for less-than-light work).

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 31, 2012

Case 6:11-cv-03325-REL   Document 23   Filed 08/01/12   Page 37 of 37